1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6              **DISTRICT OF NEVADA**
7  IRIS D. FLANIGAN,                    )
8                     Plaintiff,        )    Case No. 2:12-cv-01888-GMN-PAL
                                        )
9  vs.                                  )    **REPORT OF FINDINGS AND**
                                        )    **RECOMMENDATION**
10 CAROLYN W. COLVIN,[1]                )    (Mtn to Reverse - Dkt. #13)
                                        )
11                    Defendant.        )
                                        )
12 _____)
13         This case involves judicial review of administrative action by the Commissioner of Social
14 Security denying Plaintiff Iris D. Flanigan's claim for disability insurance benefits under Title II of the
15 Social Security Act (the "Act").
16                              **BACKGROUND**
17         On July 24, 2009, Plaintiff filed an application for disability insurance benefits, alleging she
18 became disabled on August 25, 2007, as amended at the hearing.  AR[2] 20, 36.  The Social Security
19 Administration ("SSA") denied Plaintiff's application initially and on reconsideration.  AR 73-79, 84-
20 86.  A hearing before an administrative law judge ("ALJ") was held on May 24, 2011.  AR 31-72.  In a
21 decision dated May 27, 2011, the ALJ found Plaintiff was not disabled.  AR 20-26.  The ALJ's decision
22 became the Commissioner's final decision when the Appeals Council denied review.  AR 1-4.
23         On November 5, 2012, Plaintiff filed an Application to Proceed In Forma Pauperis (Dkt. #1)
24 and submitted a Complaint (Dkt. #3) in federal court, seeking judicial review of the Commissioner's
25 _____
26         [1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on
27 February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for
   Michael J. Astrue as the Defendant in this matter.
28
           [2]AR refers to the Administrative Record, which was delivered to the undersigned upon the
   Commissioner's filing of her Answer (Dkt. #10) on March 7, 2013.

decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (Dkt. #10) on March 7, 2013.  Plaintiff filed a Motion for Remand (Dkt. #13) on April 9, 2013.  The Commissioner filed an Opposition and Cross-Motion for Summary Judgment (Dkt. #14) on May 9, 2013.  The court has considered the Motion to Remand and the Opposition and Cross-Motion.

## DISCUSSION

### I.    Judicial Review of Disability Determination

District courts review administrative decisions in social security benefits cases under 42  U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner of Social Security has held a hearing and rendered a final decision, a disability claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal district court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. § 405(g).  That statute also provides that the District Court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a District Court affirming, modifying, or reversing a decision of the Commissioner de novo.  *Batson v. Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are supported by substantial evidence, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

1    Under the substantial evidence test, the Commissioner's findings must be upheld if supported by

2    inferences reasonably drawn from the record. *Batson,* 359 F.3d at 1193. When the evidence will

3    support more than one rational interpretation, the court must defer to the Commissioner's interpretation.

4    *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human*

5    *Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995). Consequently, the issue before the court is not whether the

6    Commissioner could reasonably have reached a different conclusion, but whether the final decision is

7    supported by substantial evidence.

8    It is incumbent on the ALJ to make specific findings so that the court does not speculate as to

9    the basis of the findings when determining if the Commissioner's decision is supported by substantial

10   evidence. Mere cursory findings of fact without explicit statements as to what portions of the evidence

11   were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).

12   The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate,

13   should include a statement of subordinate factual foundations on which the ultimate factual conclusions

14   are based." *Id.*

15   **II.    Disability Evaluation Process**

16   The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182

17   (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate

18   an "inability to engage in any substantial gainful activity by reason of any medically determinable

19   physical or mental impairment which can be expected . . . to last for a continuous period of not less than

20   12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must provide "specific medical evidence" to

21   support his or her claim of disability. If a claimant establishes an inability to perform his or her prior

22   work, the burden shifts to the Commissioner to show that the claimant can perform other substantial

23   gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

24   The ALJ follows a five-step sequential evaluation process in determining whether an individual

25   is disabled. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). If at any

26   step, the ALJ makes a finding of disability or non-disability, no further evaluation is required. *See* 20

27   C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The

28   first step requires the ALJ to determine whether the individual is currently engaging in substantial

3

gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b).  If the individual is currently engaging in SGA, then a finding of not disabled is made.  If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[3]  If the individual does not have a severe medically-determinable impairment or combination of impairments, then a finding of not disabled is made.  If the individual has a severe medically-determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ to determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appedix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.  If the individual's impairment or combination of impairments meet or equal the criteria of a listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of disabled is made.  *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h).  If the individual's impairment or combination of impairments does not meet or equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the next step.

*/ / /*

---

[3] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray,* 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

Before considering step four of the sequential evaluation process, the ALJ must first determine the individual's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e). RFC is a function-by-function assessment of the individual's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments. *See* SSR 96-8p. In making this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p. To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. The ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The fourth step requires the ALJ to determine whether the individual has the RFC to perform his past relevant work ("PRW"). *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f). PRW means work performed either as the individual actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for the individual to learn the job and to perform it as SGA. *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965. If the individual has the RFC to perform his past work, then a finding of not disabled is made. If the individual is unable to perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

Step five requires the ALJ to determine whether the individual is able to do any other work considering his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g) and 416.920(g). If he or she can do other work, then a finding of not disabled is made. Although the individual generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner. The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the individual can do. *Yuckert*, 482 U.S. at 141-42.

/ / /

## II.      Factual Background.

### A.      Testimony at Administrative Hearing.

Plaintiff appeared and testified before ALJ Barry Jenkins in Las Vegas, Nevada, on May 24, 2011, with her attorney, Nicole Steinhaus. AR 31. Vocational expert Robin Generaux also appeared and testified. *Id.*

Plaintiff was born on July 8, 1956, and at the time of the administrative hearing, she was fifty-one years old. AR 36.  Plaintiff lives with her son and husband. AR 39. At the time of the hearing, she and her husband were separated, and he owned the house in which they lived. AR 39-40.  Plaintiff quit school after the tenth grade.  AR 40.  She has been jailed once for prostitution. *Id.*

Plaintiff was last employed in 2005 with Crimebusters, where she did domestic cleaning and lifting bags. AR 46.  Plaintiff testified she stopped working in 2005 because her limbs, back, and abdomen were all hurting and sore.  *Id.*  Prior to that, Plaintiff had multiple jobs, including as:  a porter for Stratosphere Gaming; a meat slicer and weigher in the meat department of Smith's Food and Drug Center; a security officer for Allied Security; a cashier and stocker at Midget Market, a grocery store; a cashier, stocker, cleaner, and food preparer at Green Valley Grocery; a maid for Molly Maid Service; a supervisor at Days Inn, where she made beds, cleaned, and pushed carts; a supervisor at Best Western Hotel, where she supervised the housekeepers; a housekeeper at Sherry's Ranch; a janitor for the Nye County School District; and a cashier/stocker/cleaner at D&T Fireworks.  AR 40-46.  In all of her previous employment, Plaintiff did heavy lifting and physical work that caused her pain in her limbs, back and abdomen. AR 47.  Plaintiff testified that she can no longer lift twenty-five to fifty pounds by herself.  AR 46.

While Plaintiff was employed at Days Inn, she was involved in an accident, where a cart flipped over onto her, causing injury to her left shoulder and hip. AR 43.

Plaintiff testified that she is unable to work because she no longer can lift objects of any significant weight, that her left arm is worn down due to osteoporosis and arthritis and the medications she is prescribed.  AR 51. In addition, the medications she takes affect her alertness and prevent her from operating machinery.  *Id*.  Plaintiff testified that she uses orthopedic devices such as a back brace to relieve her symptoms.  AR 51-52.  She testified that she can only sit for ten to fifteen minutes before

back spasms occur, and she must stand for five minutes to stop the spasm. AR 64. These back spasms occur often and at random. *Id.*

Plaintiff testified that on a normal day, she wakes up, checks on the dogs, and gets dressed. AR 54. She then sits down and watches television and talks on the phone. *Id.* She does not do any lifting, cleaning, or strenuous activity, and if something needs to be done, she calls for her son. *Id.* She sometimes washes dishes, but she must sit down to do them. AR 55. She does not cook often, but when she does, it is limited to soup and microwaveable items. Plaintiff testified that she can no longer stand and cook because it hurts her back. *Id.*

Plaintiff's son and his wife come over about every two weeks and help her with cleaning, laundry, and taking care of the animals. AR 54-55. Her son, daughter-in-law, and husband also help her get dressed, get in and out of the shower, and get ready for the day. AR 61-62.

Plaintiff testified that at the time of the hearing, she did not smoke or consume alcohol or drugs, but she admitted that she has used cocaine and marijuana in the past. AR 52.

Robin Generaux, a vocational expert, also testified. AR 65. She described Plaintiff's PRW as a cashier, housekeeper, and security guard as light work; Plaintiff's PRW as a janitor, housekeeping supervisor, and porter as medium work; and Plaintiff's PRW as a stock clerk as heavy work. Ms. Generaux also testified that employment as a housekeeper is usually preformed as medium work. *Id.* The ALJ asked whether a person of claimant's age, education, and experience who was capable of performing at the light exceptional level and was required convenient access to the bathroom, could perform Plaintiff's PRW, and Ms. Generaux testified that such a person could not. *Id.*

**B.    Plaintiff's Medical Records.**

**1.    2007 Medical Records.**

Plaintiff was seen at Advanced Medical Center ("AMC") on August 22, 2007, for complaints of chronic left shoulder and neck pain. AR 216-218, 681. She reported ongoing left shoulder pain and pain over her left trapezius muscle. AR 681. She was prescribed 800mg of ibuprofen to be taken for three weeks. AR 682. On August 25, 2007, she returned to AMC, complaining of pelvic pain. AR 213, 677. She reported irritation and incontinence when she coughed, made any straining movement, or bent over. *Id.* She also noticed that it felt "like something is falling out down there." AR 677. The

1   doctor diagnosed Plaintiff with stress incontinence, persistent incontinence, and urinary leakage. AR
2   215, 678.
3       Plaintiff went to AMC for a follow up on August 27, 2007. AR 675. She reported that the
4   ibuprofen she had been prescribed at her previous visit did not relieve her symptoms, and she continued
5   to have left shoulder pain. *Id.* She was given a cortisone injection. AR 676.
6       Plaintiff returned to AMC on September 25, 2007, for a follow up appointment. AR 206. The
7   records indicate her subacromaol bursitis had resolved, but she had osteoporosis. AR 208. She
8   reported that since the cortisone injection she received in August, her left shoulder was asymptomatic
9   and felt "wonderful." AR 671. The doctor examined Plaintiff's left shoulder, finding it had full range
10  of motion without tenderness. AR 672.
11      Plaintiff underwent an endoscopy on November 15, 2007, at Valley Hospital. AR 475. That
12  procedure revealed mild right-sided diverticulosis, a transverse colon polyp, internal hemorrhoids, and
13  spastic colon. *Id.* Plaintiff tolerated the procedure well. AR 479. The polyp was removed and
14  biopsied, and a pathology report revealed it was benign. AR 494.

15                      **2.    2008 Medical Records.**

16      Plaintiff was admitted to Valley Hospital on January 21, 2008 for a laparoscopic-assisted
17  vaginal hysterectomy for vaginal prolapse[4] and bladder suspension[5] for urinary incontinence. AR 367,
18  373, 383, 532. Prior to surgery, she reported five months of increasing pelvic pain
19  and was found to have complete uterine[6] and vaginal prolapse.[7] AR 368. Plaintiff reported having to

21          [4]Vaginal vault prolapse is a condition in which the upper portion of the vagina loses its normal
22  shape and sags or drops down into the vaginal canal or outside of the vagina. *See* UNC School of
23  Medicine Computer and Robotic Enhanced Surgery Center, available at
    www.med.unc.edu/cares/gynecologic-surgery/prolapse-treatment (last visited Apr. 1, 2010).

24          [5]Bladder suspension surgery adds support to the bladder neck and urethra, reducing the risk of
25  stress incontinence. *See* www.mayoclinic.org/bladder-neck-suspension/img-20007033 (last visited Apr.
26  2, 2014).

27          [6]Uterine prolapse occurs when pelvic floor muscles and ligaments stretch and weaken, providing
    inadequate support for the uterus, which then slips down into or protrudes out of the vagina.
28  / / /

1   push her internal tissue in repeatedly, and in order to have a bowel movement had to digitally express

2   the stool by placing pressure in the posterior vagina. *Id.* One of Plaintiff's treating physicians, Dr.

3   Sparkuhl, observed Plaintiff had genuine stress incontinence. *Id.* Her past medical history indicates

4   that her hypertension is controlled. *Id.* Dr. Mark Turner performed the procedures, and his notes report

5   that Plaintiff did well post operatively. AR 367. There were no apparent complications during the

6   procedure. AR 374. Plaintiff was discharged from Valley Hospital on January 23, 2008. *Id.*

7         On May 14, 2008, Plaintiff was seen at AMC for pain in her left shoulder. AR 203, 668. She

8   reported that after she received the last cortisone injection in 2007, her shoulder had been asymptomatic

9   for eight months, and at the beginning of May 2008, the pain returned. AR 204, 668. She received

10   another cortisone injection. AR 205, 669.

11         On July 14, 2008, Plaintiff went to Desert View Family Medical Center because of left shoulder

12   pain. AR 243. She was found to have tendon disorder and was prescribed pain medication. AR 243-

13   244. Dr. Dean Yarbro examined Plaintiff's left shoulder on July 15, 2008. AR 666. He found that her

14   left shoulder was within normal limits. *Id.*

15         On November 22, 2008, Plaintiff had an MRI of her left shoulder after reporting shoulder pain.

16   AR 198. On December 29, 2008, Plaintiff went to Desert View Family Medical Center to receive the

17   results of her MRI. AR 227. It revealed degenerative changes within the left shoulder, with thinning

18   and tendonitis of the surpaspinus tendon. *Id.* There was no evidence of a rotator cuff tear. *Id.* On

19   examination, Plaintiff had tenderness and decreased range of motion in her left shoulder. AR 228.

20   Plaintiff was diagnosed with tendon disorder in her left shoulder. *Id.*

21         Plaintiff was seen at Desert View Medical Center on December 11, 2009. AR 315.

22             **3.**     **2009 Medical Records.**

23         Plaintiff saw Dr. Derek Foreman at Spring Mountain Chiropractic and Rehabilitation on January

24

25   *See* www.mayoclinic.org/diseases-conditions/uterine-prolapse/basics/definition/con-20027708 (last

26   visited Apr. 2, 2014).

27       [7]Vaginal prolapse occurs where the vagina stretches or expands to protrude on other organs and

28   structures. *See* my.clevelandclinic.org/urology-kidney/diseases-conditions/vaginal-prolaps.aspx (last

    visited Apr. 2, 2014).

19, 21, 23, 29, and 30, 2009, for severe dull throbbing pain in her neck and numbness and tingling in her fingers. AR 497, 514. Dr. Foreman diagnosed Plaintiff with disc degeneration, cervical brachial syndrome,[8] nerve compression syndrome,[9] kyphosis/hypolordosis[10] all of the cervical spine and segmental dysfunction[11] of the thoracic spine. AR 520.

On December 10, 2009, Plaintiff saw Dr. Jerrold M. Sherman, M.D. for an orthopedic consultative examination for the Bureau of Disability Determination. AR 254-57. The examination of Plaintiff's neck and upper extremities revealed a "100% normal, pain-free range of motion of the neck, both shoulders, elbow wrists, and small joints of the hands and fingers." AR 255. The examination of her spine in the standing position showed a normal contour with one hundred percent normal range of motion. *Id.* She complained of pain during the entire range of motion examination. *Id.* Dr. Sherman did not observe muscle spasm. *Id.* Examination in the supine revealed one hundred percent normal, pain-free range of motion of both hips and ankles. AR 256. Dr. Sherman found Plaintiff was able to sit, stand, and walk for six hours during the course of an eight-hour day without any help from a cane, brace, or assistive device. AR 256. Dr. Sherman opined that Plaintiff could frequently lift twenty-five pounds and occasionally lift fifty pounds with no restrictions. *Id.* He found she had no restrictions on forward bending at the waist, squatting, kneeling, pulling, grasping, or fine manipulation. *Id.* His

---

[8]Cervicobrachial syndrome is a non-specific term describing some combination of pain, numbness, weakness, and swelling in the neck and shoulder region. *See* www.mdguidelines.com/cervicobrachial-syndrome (last visited Apr. 2, 2014).

[9]A pinched nerve, which disrupts the nerve's function causing pain, tingling, numbness, or weakness. *See* www. mayoclinic.org/diseases-conditions/pinched-nerve/basics/definition/con-20029601 (last visited Apr. 2, 2014).

[10]Changes in the spinal alignment *See* Ja-Ho, Leigh, M.D., et al., *Dysphagia Aggravated by Cervical Hyperlordosis,* Am. J. Phys. Med. & Rehab. (Aug. 2011) at 704-05, available at http://journals.lww.com/ajpmr/Fulltext/2011/08000/Dysphagia_Aggravated_by_Cervical_Hyperlordosis.13.aspx (last visited Apr. 2, 2014).

[11]A chiropractic term for a focal misalignment or subluxation of vertebra, treated by spinal manipulations intended to free 'life forces' and allow the body to heal itself. *See* McGraw-Hill Concise Dictionary of Modern Medicine (2002), available at www.medical-dictionary.thefreedictionary.com/segmental+dysfunction (last visited Apr. 2, 2014).

1   overall impression was that Plaintiff complained of low back pain and bilateral hip pain without

2   neurological deficit.  *Id.*  Additionally, in Dr. Sherman's Consultative Examination Medical Source

3   Statement, he found Plaintiff complained constantly of pain throughout the exam and was

4   "manipulative."  AR 259.

5                              **4.      2010 Medical Records.**

6        Plaintiff completed an Assessment Questionnaire on January 7, 2010, in which she indicated she

7   used the restroom more than twenty times per day and got up three times at night. AR 537. She also

8   indicated she always has pain during sexual intercourse and as a result she always avoids it.  *Id.*  She

9   also reported pain associated with her bladder and pelvis all the time,  and she always has urgency after

10  going to the bathroom, which usually bothers her.  *Id.*  Plaintiff was seen at Spring Mountain Women's

11  Health on January 5, 2010, for cystocele[12] without uterine prolapse. AR 595. Dr. Alexander Norton,

12  M.D., assessed Plaintiff with atrophic vulvovaginitis,[13] cystocele, and menopausal and postmenopausal

13  disorder. Id. He directed her to follow up with a urologist.  *Id.*

14       Plaintiff was examined by urologist Dr. Jim Crowley, M.D., on January 7, 2010.  AR 532.  She

15  reported that her bladder prolapse had returned.  AR 578.  She told Dr. Crowley her hysterectomy and

16  bladder suspension surgery in January 2008 had improved her condition for approximately seven

17  months, but that she started having suprapubic and vaginal pain with a full bladder especially when

18  lifting.  *Id.*  She also complained of severe urgency to urinate, especially when lifting.  *Id.*  She did not

19  return to see Dr. Turner or Dr. Sparkuhl, the physicians who handled her care prior to and during her

20  first surgery.  *Id.*  Dr. Crowley reported Plaintiff had chronic pain with her back and is "essentially

21  disabled."  *Id.*  Dr. Crowley found Plaintiff had grade 2 cystocele and grade 2 rectocele, as well as a

22  _____

23       [12]A cystocele is the bulging or dropping of the bladder into the vagina.  *See* National Kidney and
24  Urologic Diseases Information Clearinghouse, available at
    www.kidney.niddk.nih.gov/kudiseases/pubs/cystocele (last visited Apr. 1, 2014).

25       [13]A common condition associated with decreased estrogenization of the vaginal tissue.
26  Symptoms include dryness, irritation, soreness and dyspareurina (painful sexual intercourse) with
27  urinary frequency, urgency, and urge incontinence.  *See* MacBride, Maire B., et al., *Vulvovaginal
    Atrophy*, Mayo Clin. Proc. (Jan. 2010), available at
28  http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2800285/ (last visited Apr. 2, 2014).

tender scar from the bladder suspension surgery.  *Id.*  He opined Plaintiff would need vaginal reconstruction surgery, but because this might make her urgency and urge incontinence worse, he recommended cystoscopy with urodynamics[14] prior to any surgical intervention.  *Id.*

Plaintiff was seen on January 22, 2010, at Desert View Medical Center.  AR 320.  At that time, she complained about her cystocele, rectocele, and urinary incontinence.  *Id.*  She stated that both problems have been "quite annoying," and she wanted to pursue surgical remedies.  *Id.*

A biopsy of Plaintiff's bladder was done on January 25, 2010, and it was unremarkable. AR 530. No malignant cells were identified. AR 531.

Plaintiff returned to see Dr. Norton at AMC on April 6, 2010, for follow-up visit. AR 597. On examination, he found a rectocele.  *Id.*

A CT scan was taken of Plaintiff's neck on May 17, 2010.  AR 338.  It showed the neck was within normal limits.  *Id.*

Plaintiff was admitted to Sunrise Hospital on June 21, 2010, for complaints of overactive bladder and symptomatic vaginal prolapse.  AR 286, 290.  Dr. Geoffrey Heish, M.D., examined Plaintiff while she was under anesthesia without any complications.  AR 290.  Dr. Heish found grade 2-3 cystocele, grade 1 rectocele,[15] and grade 1 vault prolapse.  *Id.*  Upon making these findings, Plaintiff was immediately taken to the operating room to repair the conditions.  *Id.*  The procedures were completed without complications, and Plaintiff tolerated them well. AR 291.  Plaintiff was discharged from the hospital on June 22, 2010.  AR 286.

---

[14]Urodynamis are a set of tests that determine the causes of bladder function problems. Cytoscopy is a test that looks in the bladder to diagnose bladder problems or conditions.  *See Information about Urodynamics and Cytoscopy*, Johns Hopkins Women's Center for Pelvic Health, available at www.hopkinsmedicine.org/johns_hopkins_bayview/_docs/medical_services/obstetrics_gynecology/urodynamics_cystoscopy_pamphlet.pdf (last visited Apr. 2, 2014).

[15]A recotcele is a herniation of the rectum into the posterior vaginal wall that results in a vaginal bulge.  *See* Beck, David E. et al., *Rectocele,* Clinics in Colon and Rectal Surgery, June 2010 (available at www.ncbi.nlm.nih.gov/pmc/articles/PMC 2967328 (last visited Apr. 1, 2010).

Plaintiff was seen by Dr. Heish on June 2010.[16]  AR 287.  She underwent multichannel urodynamic testing that "showed no evidence of stress incontinence with prolapse reduction." *Id.*  She was assessed with symptomatic vaginal prolapse and an overactive bladder. *Id.*  Dr. Heish scheduled Plaintiff for an examination under anesthesia with cytoscopy, vaginal repair, and vault suspension.  AR 288.

X-rays were taken of Plaintiff's cervical spine, left hip, left shoulder, and lumbar spine on November 3, 2010. AR 300-303, 655, 657, 659, 661. The x-ray of Plaintiff's cervical spine showed muscle spasm this disease and spondylosis.  AR 655.  The x-rays of Plaintiff's left hip, left shoulder, and lumbar spine each showed no significant abnormality.  AR 300-303, 657, 659, 661.

### 5.   2011 Medical Records.

An x-ray of plaintiffs lumbar spine was taken on May 11, 2011.  AR 652.  That x-ray showed no significant abnormality of the lumbar spine.  *Id.*  The x-ray also showed that the alignment of the lumbosacral spine was within normal limits.  *Id.*  There was no evidence of fracture, and the intervertebral disc spaces were well-preserved.  *Id.*  There was no significant degenerative disease and no spondylosis[17] or spondyloisthesis.[18]  *Id.*

On June 1, 2011, Plaintiff was seen at Healthcare Partners for severe depression and hallucinations.  AR 648.  She reported that her son had killed her grandson, who was about six years old, and her family had made threats against her.  *Id.*  She was also dealing with her son being on death row, and she reported hallucinating that her grandson spoke to her at night.  AR 648.  She was taking Xanax, but it was not fully helping.  *Id.*  Plaintiff was advised to see a psychiatrist. AR 649.

Plaintiff was seen by Dr. Racoma at Associated Psychiatric Services on June 23, 2011. AR 590.

---

[16]There appears to be a typographic error on the top of this document.  The report is dated and signed June 21, 2010, and appears to have been dictated on June 20, 2010.  It reports that the Plaintiff was scheduled for examination under anesthesia and certain procedures that occurred on June 21, 2010.

[17]A disorder in which there is abnormal wear on the cartilage and bones of the neck. *See* www.nlm.nih.gov/medlineplus/ency/article/000436.htm (last visited Apr. 2, 2014).

[18]A condition in which a vertebra slips out of proper position onto the vertebra below it. *See* http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm (last visited Apr. 2, 2014).

1  She reported that she was depressed and that she used marijuana to sleep. *Id.* She told the doctor that

2  her grandson had been killed by her son, and she had not had closure. *Id.* The doctor's clinical

3  impression was that she was alert, not suicidal homicidal, or psychotic. *Id.* He noted no cognitive

4  deficits or delusions. *Id.* He diagnosed her with depression and bipolar disorder, and he prescribed

5  Zyprexa, Pristiq, and Xanax. *Id.* Plaintiff also saw Dr. Racoma on June 23, 2011, June 30, 2011,

6  August 5, 2011, and October 6, 2011. AR 614, 684-85.

7      Plaintiff was seen on June 28, 2011, at Healthcare Partners. AR 644. The notes from that visit

8  indicate Plaintiff was "really doing a lot better." *Id.* She indicated that her medication was helping and

9  she felt "calm for once." *Id.* She had no particular complaints and stated she felt fine. *Id.* The doctor

10  did observe that there were some significant mental issues that were being worked out by the

11  psychiatrist. AR 645.

12      Plaintiff was seen at Healthcare Partners on July 26, 2011, complaining of back pain and

13  arthritis. AR 639. She reported that her psychiatric issues had gotten better and that she was seeing Dr.

14  Racoma for treatment. AR 640. She had no complaints other than the chronic pain in her back and her

15  arthritis. *Id.* She indicated that Lortab helped with the pain. *Id.* The doctor's notes from that visit

16  indicate that Plaintiff was doing "a lot better." AR 641.

17      On August 11, 2011, Plaintiff was involved in a motor vehicle accident, and on August 12,

18  2011, she saw a doctor at Healthcare Partners for pain in her shoulder, back, low back, and neck. AR

19  628. X-rays were taken of Plaintiff's back, neck, and low back, none of which showed any acute

20  injuries. AR 629. Specifically, the x-ray of Plaintiff's thoracic spine showed slight spinal curvature and

21  lower thoracic degenerative change. AR 634. The x-ray of Plaintiff's lumbar spine showed no

22  degenerative changes. AR 636. The x-ray of Plaintiff's cervical spine was consistent with muscle spasm

23  and showed slight spondylosis at C5-6. AR 638. Plaintiff was prescribed Motrin, an antibiotic, and

24  Lortab and advised follow up with her primary care physician in one week. AR 630.

25      On August 23, 2011, Plaintiff saw Dr. Norton at Advanced Medical Associates for a yeast

26  infection. AR 605. At that time, he also assessed Plaintiff with incontinence. *Id.*

27      That same day, James Flowers, M.D., one of Plaintiff's treating physicians, completed a

28  Physical RFC Questionnaire for Plaintiff. AR 618-622, 625. Dr. Flowers diagnosed Plaintiff with low

1  back pain syndrome, lumbar spondylosis, osteoarthritis of the shoulder, and cervical spine spondylosis.

2  *Id.* He noted her prognosis was poor. *Id.* He characterized Plaintiff's pain as heavy, daily, and made

3  worse by housework. *Id.* Pain medication and chiropractic treatments helped relieve Plaintiff's

4  symptoms. AR 619. Dr. Flowers indicated that Plaintiff's impairments have lasted or could be

5  expected to last at least twelve months. *Id.* He did not believe Plaintiff was a malingerer. *Id.* He noted

6  Plaintiff also suffered from depression and anxiety. *Id.* He believed Plaintiff's pain or other symptoms

7  would constantly interfere with her attention and concentration at work. *Id.*

8  He opined that Plaintiff could only continuously sit for five minutes and stand continuously for

9  five to ten minutes. AR 620. During an eight-hour work day, Plaintiff could stand or walk for less than

10  two hours, sit for about two hours with pillows, and would need to include periods of walking during

11  the day. *Id.* Each walk break would have to occur every five to ten minutes and should last five

12  minutes. *Id.* He opined that Plaintiff must have a job where she could shift at will from sitting to

13  standing and walking and would need to take at least four to six unscheduled breaks during an eight-

14  hour workday. *Id.* Plaintiff would also need to rest for a half hour to an hour before returning to work.

15  AR 621. He found Plaintiff should only occasionally lift less than ten pounds and should never lift

16  anything more than ten pounds. *Id.* He believed Plaintiff would have to miss more than three days of

17  work per month as a result of her impairment or treatments. AR 622. He also noted that Plaintiff has a

18  bladder prolapse and loses urine when bending and twisting and must wear pads. *Id.*

19  Plaintiff was seen at Chiropractic Biophysics on eight occasions in August 2011. AR 613.

20  **6.    Other Records.**

21  Dr. Pastora Roldan, Ph.D. completed a Psychiatric Review Technique assessment for Plaintiff,

22  considering records from July 1, 2005, to June 30, 2009. AR 271-283. She found that there was

23  insufficient medical evidence to determine whether Plaintiff had an anxiety-related disorder. AR 271.

24  The assessment provides that Dr. Roldan also completed three narratives, dated February 5, 2010,

25  February 10, 2010, and March 30, 2010, but they are not part of the record. AR 283.

26  On May 31, 2010, Dr. William Dougan, M.D., completed a Report of Contact. AR 285. He

27  found Plaintiff's vaginal prolapse condition was determined not to last twelve months and was

28  presently non-severe. *Id.* In addition, Plaintiff had no medically determinable back impairment. *Id.*

1

### III.    The ALJ's Decision.

2      The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520

3  and 416.920, and issued an unfavorable decision denying the claim for benefits on May 27, 2011.  AR

4  20-26.  The ALJ found Plaintiff last met the insured states requirements of the Social Security Act on

5  June 30, 2009.  At step one, the ALJ found that Plaintiff did not engage in SGA between her amended

6  alleged onset date of August 25, 2007, through June 30, 2009, her date last insured ("DLI").

7      At step two, the ALJ found Plaintiff had one severe medically-determinable impairment:

8  disorder of the back.  He found her allegations of vaginal prolapse, urinary frequency, and hypertension

9  were non-severe for Social Security purposes because they only had a "slight effect" on Plaintiff's

10  ability to perform basic work activities.

11      At step three, the ALJ concluded Plaintiff did not have an impairment or combination of

12  impairments that met or medically equaled one of the listed impairments in 20 C.F.R.  Part 404,

13  Subpart P, Appendix 1.  The ALJ concluded Plaintiff had the RFC to perform light work with the

14  following limitations: she should not lift and carry more than ten pounds frequently and twenty pounds

15  occasionally.  She could sit for a cumulative total of six hours of an eight-hour workday.  She could

16  stand and/or walk for a cumulative total of two hours of an eight-hour workday.

17       The ALJ found that the objective medical evidence, and the record as a whole, failed to

18  support any finding of disability.  He found that only one MRI taken of Plaintiff's shoulder in

19  November 2008 showed any abnormalities, and they were insignificant because "they are not

20  abnormalities inconsistent with [Plaintiff's] age."  AR 23.  He also found Plaintiff had vaginal vault

21  repair in January 2008 and for "uterine/vaginal relapse"[19] in July 2010 for difficulties with bowel

22  movements and urinary incontinence.  The ALJ relied on consultative orthopedic examiner Jerrold

23  Sherman's report which found Plaintiff was "manipulating"  and could perform a full range of medium

24  work.  *Id.*  The ALJ afforded Dr. Sherman's opinion "significant weight" because it was an opinion

25  issued in the doctor's area of medical expertise, was based upon a physical examination of Plaintiff, and

26

27  _____

28      [19]Throughout his opinion, the ALJ refers to Plaintiff's condition as a vaginal/bladder "relapse"
   rather than the medically correct term, vaginal/bladder prolapse.

1    was supported by laboratory and clinical findings in the record.  Although he found Plaintiff could work

2    at the medium level, the ALJ gave Plaintiff the "maximum benefit of the doubt" and reduced her

3    exertional level to light "because 'heavy' exertion would likely exacerbate her urinary incontinence

4    issues." AR 24.  The ALJ also determined Plaintiff was only able to stand or walk to two hours instead

5    of six "in consideration of her testimony[] and the record in its entirety, which includes updated medical

6    records." *Id.*  He observed that there is no opinion evidence from her providers indicating Plaintiff is

7    unable to work or demonstrating functional limitations rendering her disabled.

8         The ALJ also considered the findings of the Disability Determination Services ("DDS") and

9    afforded them the weight of a non-examining expert.  DDS consultants found Plaintiff's vaginal

10   prolapse was not expected to last longer than a year.  The ALJ also found the DDS opinion was

11   consistent with the mild laboratory and imaging findings of record.  DDS consultants considered

12   Plaintiff's subjective complaints and noted that she never had one surgery to resolve her alleged hip and

13   lumbar issues.  Additionally, the ALJ found that the "record also indicated her vaginal relapse (sic)

14   surgeries were relatively although not fully successful." AR 25.  The ALJ found Plaintiff's

15   hypertension was well-controlled with medication, and the record did not support any finding of a

16   mental impairment.

17        At step four, the ALJ concluded that Plaintiff was capable of performing her PRW as a cashier

18   and security guard "pursuant to the vocational expert's testimony[] in hypothetical number two." *Id.*

19   The ALJ determined Plaintiff could perform them both as they are generally performed and as she

20   actually performed them.  Alternatively, the ALJ found at step five that she could still find "virtually

21   unlimited work at the 'light' exertional level according the vocational expert." *Id.*  He found that her

22   urinary incontinence would not preclude employment because it was consistent with a normal work

23   schedule, including  mid-morning, lunchtime, and mid-afternoon breaks.

24   **IV.    The Parties' Positions.**

25        **A.    Plaintiff's Motion for Reversal and/or Remand**.

26        Plaintiff asserts that the ALJ's decision at step four is not supported by substantial evidence.

27   Plaintiff argues the ALJ limited her to standing and/or walking two hours cumulatively, but the

28   vocational expert was not asked to assume this limitation in the hypothetical posed.  If the ALJ chooses

to rely on the testimony of a vocational expert, the hypothetical posed must be accurate, detailed, and supported by the medical record.  Where the hypothetical does not present all of the claimant's limitations, the vocational expert's testimony has no evidentiary value.  Additionally, because the ALJ found Plaintiff could stand or walk for only two hours of an eight-hour day, he should have also found she was only capable of sedentary work, not light work.  Therefore, there is no substantial evidence that Plaintiff could perform her PRW at step four.

**B.    The Commissioner's Cross Motion to Affirm and Opposition**.

The Commissioner concedes the ALJ erred in finding Plaintiff could perform her PRW as a security guard and cashier as she actually performed those jobs.  However, but because the *Dictionary of Occupational Titles* contains several cashier jobs at the sedentary level the Commissioner argues this error is harmless.  With respect to Plaintiff's contention that the ALJ improperly relied on the vocational expert's testimony, the Commissioner asserts it is Plaintiff's burden to show she could not return to her PRW, which she has not done.  The Commissioner also asserts that even if the ALJ erred at step five in finding that Plaintiff could find "virtually unlimited work" at the light exertional level, that error was also harmless.  The Commissioner argues that although being limited to two hours of standing and walking would reduce the number of light jobs available, it would not "completely erode the occupational base," especially because the ALJ found Plaintiff had no postural, visual, communicative, or environmental limitations.  The Commissioner also asserts that Plaintiff has not challenged the ALJ's RFC finding or his finding that Plaintiff was not fully credible, and she has therefore conceded these findings.  If the court finds that the ALJ's error is reversible, the Commissioner requests the court remand for a further administrative proceedings and not for a finding of disability because there is no basis to conclude on this record that Plaintiff's unchallenged RFC would preclude all work.

**V.    Analysis and Findings**

Reviewing the record as a whole, the court finds the ALJ committed reversible error.  The vocational expert testified that Plaintiff's past relevant work as a cashier and security guard were classified as light.  AR 66.  Plaintiff's past relevant work as a housekeeper (as actually performed), housekeeping supervisor and porter were classified as medium.  *Id*.  Her past relevant work as a stock

clerk was classified as heavy.  *Id.*  The ALJ's decision concluded that Plaintiff was capable of performing light work.  Specifically, he found that she could lift and carry no more than ten pounds frequently, twenty pounds occasionally, and could sit for six of eight hours cumulatively in a work day, and stand or walk two of eight hours cumulatively in an eight hour work day.  AR 22.  At step four, the ALJ found she could perform her past relevant as a cashier and a security guard and was therefore not disabled.  AR 25.  The Commissioner concedes that the ALJ erred in finding Plaintiff could perform these jobs as actually performed.  However, because the *Dictionary of Occupational Titles* contains several cashiers jobs classified at the sedentary level, the Commissioner argues this error is harmless.  The Commissioner acknowledges that light work jobs involved " a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b); SSR 83-10.  The hypotheticals posed to the vocational expert did not present the limitation the ALJ found that Plaintiff could only stand or walk for two hours of eight hours cumulatively in an eight hour work day.

The ALJ "gave the Plaintiff the benefit of the doubt" by finding she had the residual functional capacity to perform light work rather than medium work as Dr. Sherman found.  His articulated basis for finding Plaintiff had the residual functional capacity to perform light work was based on her urinary incontinence issues.  AR 24.  He specifically found that the Plaintiff was capable of performing her past relevant work as a cashier and security guard pursuant to the vocational expert's testimony, in the ALJ's second hypothetical.  *Id*.

The first hypothetical posed to the vocational expert assumed a person of the Plaintiff's age, education and experience capable of performing at the light exertional level who was required to have convenient access to the bathroom as needed.  AR 67.  The ALJ asked if such a person was capable of performing Plaintiff's past relevant work.  The vocational expert responded that such a person could not because "all of these jobs require constant attention to duty."  *Id*.  The ALJ then asked the vocational expert whether a person capable of working at the light exertional level without the restriction regarding access to the bathroom was needed could do other work.  *Id*.  The vocational expert responded, "there aren't any at the light exertional."  *Id*.  The vocational expert testified that a person who did not have the freedom to use the restroom up to eight times a day as the Plaintiff testified "would exceed

employer tolerance" and that her past relevant work as cashier and security "would be out."  AR 68.

The following colloquy occurred between the ALJ and the vocational expert:

> ALJ:  If we had a person of the claimant's age, education, and experience who was capable or deemed capable of performing at the light exertional level who is required convenient access to the bathroom as needed, could she perform any of her past relevant work?
>
> VE:  No, Your Honor.  All of these jobs require constant attention to duty.
> . . .
>
> ALJ:  If we had a person who would [be] capable of working at the light exertional level without the restriction regarding access to the bathroom as needed, is there other work she could do?
>
> VE:  There aren't any at the light exertional.
>
> ALJ:  I haven't really put any restrictions on it, so the whole field of light work will be available, right?
>
> VE:  Without any restrictions?
>
> ALJ:  Without any additional restrictions.
>
> VE:  Yes.
>
> ALJ:  How about with the bathroom access?
>
> VE:  Well cashier and security guard would be out. . . . [T]here really is not an opportunity for frequent use of the bathroom because of the constraints typically placed on lower level workers.  She simply wouldn't have the kind of freedom to use the restroom., She testified up to eight times per day, that would exceed employer tolerance.

AR 67-68.

Although the ALJ is not required to rely on vocational expert testimony at step four, when the ALJ does, the hypothetical question(s) must set out *all* of the claimant's impairments for the vocational expert's consideration.  *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (vocational expert's testimony useful at step four but not required); *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir. 1996) (ALJ did not err at step four by failing to call vocational expert); *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (citing *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995)).  The ALJ's description of the claimant's limitations must be "accurate, detailed, and supported by the medical record."  *Id*.  If the ALJ's hypothetical to a vocational expert does not reflect all of the claimant's limitations, then the "expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in

1   the national economy." *Matthews*, 10 F.3d at 681 (citing *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th
2   Cir. 1991)).

3            The ALJ found that the Plaintiff had the residual functional capacity to perform light work, but
4   was limited to standing or walking for two of eight hours cumulatively in an eight hour work day which
5   was not included in any of the hypotheticals posed to the vocational expert. The ALJ found that
6   Plaintiff had the residual functional capacity to perform light work rather than medium work as Dr.
7   Sherman opined, because of urinary incontinence , yet completely disregarded the vocational expert's
8   testimony that Plaintiff could not perform her past relevant work as a cashier or security guard because
9   of her need for frequent access to the bathroom.

10           The ALJ also found at step five that Plaintiff had the residual functional capacity to perform a
11  significant number of jobs in the national economy and could find "virtually unlimited work at the
12  'light' exertional level according to the vocational expert." The vocational expert testified to no such
13  thing. The court concludes the ALJ committed reversible error. The court will therefore recommend
14  that Plaintiff's Motion to Remand be granted. *See Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir.
15  2004) (except in rare circumstances, when an administrative determination is reversible, the proper
16  course is to remand to the agency).

17           For all of the foregoing reasons,
18           **IT IS RECOMMENDED**:
19           1.      Plaintiff's Motion for Remand (Dkt. #13) be **GRANTED**.
20           2.      The Commissioner's Cross-Motion for Summary Judgment (Dkt. #14) be **DENIED**.
21           3.      This case be remanded to the ALJ for further administrative action consistent with this
22                   Report of Findings and Recommendation.
23           Dated this 28th day of May, 2014.

25                                                          PEGGY A. LEEN
26                                                          UNITED STATES MAGISTRATE JUDGE

21